Shawn C. JEANES, Wayne K. Mains, individual, Plaintiffs,

v.

ALLIED LIFE INSURANCE COMPANY, Defendant.

No. 4–98–CV–90386.

United States District Court, S.D. Iowa, Central Division.

Sept. 21, 2001.

Natasha Roit, Los Angeles, CA, for plaintiff.

Deborah M. Tharnish, Des Moines, IA, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRATT, District Judge.

Plaintiffs' Revised Third Amended Complaint (# 125) in this matter was filed on February 12, 2001. In the Complaint, Plaintiffs jointly allege that Defendant Allied Life Insurance Company ("Allied") is liable for breach of contract, fraud by concealment, fraud by intentional misrepresentation, breach of contract for failure to pay commissions due, and willful failure to pay salary. Additionally, Plaintiff Wayne Mains ("Mains") individually alleges that Allied breached insurance policy contracts and is liable for fraud and conversion. In an order dated June 25, 2001 (# 159), the Court entered judgment for Plaintiffs on their claim of failure to pay commissions due. Allied paid the Plaintiffs the amount of commissions it believed were owed. Specifically, Mains received $82,565.94 and Plaintiff Jeanes ("Jeanes") received $60,296.52. *See* Ex. 106; Ex. 107; Ex. 108. The Court left for determination at trial the issue of whether additional commissions beyond those amounts were owed either Plaintiff.

The parties entered into a stipulation to waive jury trial and present the matter to the Court on July 9, 2001 (# 174). Bench trial in this matter began on July 17, 2001. The parties were ordered at the conclusion of the trial to submit their closing arguments and proposed findings of fact and conclusions of law to the Court by August 8, 2001. Plaintiffs timely filed their closing argument (# 184) on August 8, 2001 (# 183). Defendant, however, did not file its closing argument until August 10, 2001, two days past the court-ordered deadline. While it would be within the Court's discretion to disregard Defendant's closing argument entirely on the basis of untimely filing, the Court declines to do so. The Court accepts the late filing based upon its exercise of discretion. Neither party filed a document specifically entitled "Proposed Findings of Fact and Conclusions of Law," though the Court believes that the contents of such a document are essentially included in the parties closing arguments. The matter is fully submitted.

### I. RULING ON DEFENDANT'S MOTION IN LIMINE AND OTHER EVIDENTIARY ISSUES

On July 6, 2001, Defendant Allied filed a motion in limine (# 167) raising several

evidentiary issues. The Court deferred ruling on the motion until after trial.

Defendant first seeks to have the Court exclude "any matters relating to statements made by Shawn Jeanes respecting conversations with Tom Van Fossen, concerning statements made by John Evans, Wendall Crosser, Jim Van Elsen, Paul McGillivray, John Duffy, Sam Wells, or any other Allied Life agents or executives regarding the issue of maximizing executive bonuses relating to the second cost of insurance increase." Mot. in Limine at 1. Defendant contends that such statements are inadmissable hearsay not subject to an exception. Evidence at trial indicates that Tom Van Fossen resigned from the employment of Allied Life on April 1, 1997. He remained on the payroll pursuant to the terms of a severance package for approximately six months thereafter. Pursuant to Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay if the statement is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Because Mr. Van Fossen was not actually employed by Allied after his resignation date of April 1, 1997, any statement made by him after that date would be hearsay and inadmissible. Hence, the Court has not considered any evidence of statements allegedly communicated by Mr. Van Fossen after the date of his resignation for the truth of the matter asserted.

Defendant next seeks exclusion of any statements made by Richard Kaufman regarding conversations with Tom Van Fossen. As indicated *supra*, the Court agrees that any evidence of statements by Van Fossen after his date of resignation constitutes inadmissible hearsay. Therefore, the Court has not considered any evidence of such conversations with Van Fossen for the truth of the matter asserted.

Defendant also requests that the Court exclude any testimony relating to the policyholder class action suit initiated in California in 1998, including any testimony by Tim Dillon. Because Mr. Dillon did not testify and no issues regarding the 1998 action arose at trial, the Court believes this issue is moot.

Defendant seeks exclusion of any matters relating to claims for damages resulting from the 1991 cost of insurance increase ("COI"). The Court agrees that, pursuant to its Summary Judgment Order dated July 10, 2000(# 81), claims relating to the 1991 increase are barred on statute of limitations grounds. Therefore, the Court will not consider any evidence relating to the 1991 increase.

Defendant seeks to exclude any evidence regarding damages, other than ongoing earned commissions, beyond July 9, 1999, the date on which new Allied policies ceased to be written. The Court believes that Plaintiffs have presented competent evidence that it is possible that they could have earned additional first year commissions on dates after July 9, 1999. The Court believes such evidence is relevant to the issue of damages and therefore, overrules Defendant's motion on this issue.

Defendant's request to exclude all evidence of lost profits is overruled. Plaintiffs, as part of their case in chief, have alleged that their resignations from Allied amounted to constructive discharge rather than voluntary terminations. Should Plaintiffs be able to prove their claims of constructive discharge, evidence relating to lost profits would be relevant and highly probative to any potential award of damages.

Defendant seeks to exclude statements from Plaintiffs and their witnesses, including expert witnesses, regarding Plaintiffs claims for damages for lost commissions, due to "Plaintiffs' failure to provide a foun-

dation for their commission claims and failure to respond to Defendant's discovery requests, and failure to substantiate the amount they believe they are owed." The Court overrules this item of Defendant's motion. Plaintiffs have stated a valid claim pursuant to the Iowa Wage Payment Collection Act and are entitled to present evidence to this Court to prove their claim. The Court does not believe Plaintiffs' answers to Defendant's propounded interrogatories are so lacking as to require exclusion of evidence supporting their claims regarding commissions, particularly in light of the fact that commission statements and other items upon which Plaintiffs would likely base their evaluation of commissions owed are maintained by Allied.

Defendant seeks to exclude any statements or testimony from Plaintiffs and Plaintiffs witnesses, including experts, regarding Plaintiffs' claims for damages apart from the damages expressly contracted for by the parties. The Court refers Defendant to its order of June 25, 2001 (# 159) wherein the Court indicated that there was no provision in the parties' contract governing the rights of the parties upon breach of the contract by Allied and that future lost profits were a reasonable measure of damages in this case, should Plaintiffs be able to prove their claim. Therefore, Defendant's motion as to this issue is denied.

Defendant's motion in limine requests the Court exclude any correspondence or statements between Plaintiff or Plaintiffs' attorneys, and Defendant's present or former attorneys regarding document production and commissions in this case. Defendant claims such items are irrelevant and contain settlement discussions. The Court, however, believes that such documents are highly probative of and relevant to the issue of intent under Plaintiffs' Wage Payment Collection Claim. For that

reason, the Defendant's motion to exclude such evidence is denied.

Finally, Defendant requests that the Court exclude the expert testimony of Scott Mowry pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. The standard for the admissibility of expert testimony was clarified in *Daubert*. When faced with a challenge to the offer of scientific evidence or testimony, the trial judge must determine that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 580, 113 S.Ct. 2786. *Daubert* suggests that judges consider four factors in determining the admissibility of expert testimony: 1) whether the theory or technique has been or can be tested; 2) whether the principle has been subjected to peer review and publication; 3) whether the known or potential error rate of a certain scientific technique has been evaluated; and 4) whether there is general acceptance in the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786.

The Court believes that Mr. Mowry's method of determining lost future profits using a method of projecting income based on historical growth rates is a relatively common technique for predicting lost income and is generally accepted within the scientific community. Defendant's own expert testified that projections are one of the methods used in doing business valuations. *See* Trial Tr. at 625. The mere fact that Defendant's expert disagrees

with growth rates applied in Mr. Mowry's techniques in this particular case goes to the weight of the evidence rather than to its admissibility. Additionally, the Court believes that Mr. Mowry is qualified to make such projections. He holds a bachelor's degree in economics from Claremont McKenna College, a master's degree in business administration and finance and accounting from the University of Chicago, is a licensed certified public accountant in the State of California, and is one of the founders of a firm specializing in litigation consultation and business valuations. *See* Trial Tr. at 490–91. Additionally, Mr. Mowry is a member of the American Institute of CPAs, the California Society of CPAs, the Association of Certified Fraud Examiners, and is a candidate member of the American Society of Appraisers. *See id.* at 491. Given Mr. Mowry's extensive background in making the type of projection he testified to at trial, the Court believes that Mr. Mowry is more than qualified as an expert in this matter and that his opinions will assist the Court in determining matters at issue in this trial. For these reasons, Defendant's *Daubert* objection is overruled.

A final matter concerns the Court's deferred ruling on items of evidence offered at trial. These items are detailed in a document entitled Final Joint Exhibit List and Designation of Objections. The Court finds that Exhibits 1–8, 10–13, 15–26, 28, 30–32, 38–39, 48–54, 56, 69, 71, 76–77, 99–104, 106–08, 202–07, 209–11, 213, 217–18, and 221–28 have been offered, no objection has been mounted, and will be received by the Court into evidence. Additionally, Exhibits 9, 14, 47, 57–65, 78, 201, and 208 were withdrawn and will not be considered as evidence in this matter.

Defendant has waived foundation, identification, and authenticity objections on the following items. Defendant, however, objects to the admission of these items on grounds of relevancy:

- Exhibit 40: The Court agrees that this document is only relevant to the 1991 DAC tax increase. The Court has previously ruled that claims relating to the 1991 increase are barred by the Statute of Limitations. Therefore, the exhibit will not be received.

- Exhibits 41 & 42: The Court believes that these exhibits are relevant for the purpose of showing Mr. Jeanes' historical work record. The exhibits will be received for that limited purpose.

- Exhibits 43–46: The Court believes these items are related to the 1991 increase and are irrelevant to the matters now before the Court. These exhibits will not be received.

- Exhibit 105: The Court believes this document supports Plaintiffs' claims that even after the point in time when Allied began to demand the return of Allied property, it continued to send additional mailings out to Plaintiffs. As such it relates directly to the issue of whether Allied withheld commissions in good faith. The item will be received.

- Exhibits 109–112: Defendant objects to the admission of these exhibits on relevancy grounds and pursuant to Federal Rule of Evidence 408. The Court believes these documents are relevant to Plaintiffs' claims under the Iowa Wage Payment Collection Act and to issues regarding Defendant's claimed good faith basis for withholding Plaintiffs commissions. The exhibits are received.

- Exhibits 115–121: The Court believes these items are relevant to Plaintiffs' claims that Allied increased the cost of insurance in contravention of standard policy language. The exhibits will be received.

Defendants object to the following Plaintiffs' exhibits on the grounds of foundation and relevancy. Other objections to the exhibits are noted individually:

- Exhibit 27: Plaintiff offers this exhibit to demonstrate Allied's treatment of policyholders. The Court does not believe that these documents make any disputed fact in this case more or less likely than it would be without the evidence. Therefore, the exhibits will not be received.

- Exhibit 29: The notes in this exhibit reflect a telephone conversation with Tom Van Fossen. While Defendant did not object on grounds of hearsay, the Court believes that such an objection was included in Defendant's motion in limine. Because Tom Van Fossen was not an agent of Allied on the date of this conversation, this evidence is hearsay. The document will be received, though it is not admissible for the truth of the matter asserted.

- Exhibits 33–34. These exhibits are admitted. To the extent they reflect conversations with Tom Van Fossen at a point that Van Fossen was not an agent of Allied, however, the items are hearsay and will not be considered for the truth of the matter asserted.

- Exhibits 35–37. These items relate to the class action lawsuit filed against Allied. The Court does not believe that these documents make any disputed fact in this case more or less likely than it would be without the evidence. Therefore, the exhibits will not be received.

- Exhibits 66–68 & 70: These items relate specifically to Plaintiffs' asserted damages. As such, they are relevant, adequate foundation was laid at trial, and the exhibits are received.

- Exhibits 79–98. The Court believes these items are relevant and highly probative of Plaintiffs Iowa Wage Payment Collection Claim. The exhibits are received.

Plaintiffs object to the following Defense exhibits on the grounds of foundation and relevancy:

- Exhibit 215: The Court believes this document is relevant to Defendant's assertion that Mr. Mains resigned voluntarily. The exhibit is received.

- Exhibit 216: This document duplicates a portion of Plaintiffs' Exhibit 109 which was received into evidence. The exhibit will not be received.

- Exhibits 219 & 220: The items are received as they are probative and relevant to Defendant's efforts to rebut Plaintiffs' damage claims.

## II. FINDINGS OF FACT

The Court finds the following facts to be undisputed, based on the pleadings of the parties and the record now before the Court:

1. Shawn Jeanes is an individual residing in the state of California. *See* Doc. 125 at 1; Doc. 141 at 1.

2. Wayne Mains is an individual residing in the State of California. *See* Doc. 125 at 1; Doc. 141 at 1.

3. Jeanes and Mains both served as Regional Directors for Allied. *See* Doc. 125 at 1; Doc. 141 at 1. Mains entered into an Agent Contract on August 22, 1994. *See* Ex. 1. Jeanes entered into an Agent Contract on May 23, 1996. *See* Ex. 2. Both Contracts contain an item numbered 3(b) which states: "Good Faith: Both parties will, at all times, act in good faith when dealing with our policyholders and each other. You will not make any actions that suggest or encourage any policyholder to surrender or lapse any policy or to cease premium payments. Any

such activity gives us the right to terminate this Agreement for cause." Ex. 1 at 3; Ex. 2 at 3.

4. Mains owns four life insurance policies issued by Defendant. The policy numbers and face values are as follows: Policy # TC 0141569 for $250,000; Policy # IN 0174566 for $250,000; Policy # IN 0094793 for $50,000; and Policy # IN 0094794 for $50,000. *See* Doc. 125 at 1–2; Doc. 141 at 1; Exs. 3–6. Mains paid all premiums due and performed all obligations under these policies. *See* Doc. 125 at 17; Doc. 141 at 6.

5. Allied is a corporation organized and existing under the laws of the State of Iowa, with its home office located in Des Moines, Iowa. *See* Doc. 125 at 2; Doc. 141 at 1. Allied conducts business relating to insurance in Los Angeles County, California. *See id.*

6. Allied became a publicly held corporation in November 1993. *See* Trial Tr. at 27 (Crosser); Ex. 7 at 1.

7. Wendell Crosser worked for Allied from August 1993 to March 1999 in the position of Vice President and also as Treasurer through his role as Chief Financial Officer. Trial Tr. at 26.

8. Don Iverson was employed as a financial actuary for Allied from December 30, 1993 until May 1, 1995. Trial Tr. at 106 (Iverson). From May 1, 1995 to late October 1999, Iverson was employed as Chief Actuary for Allied. *Id.*

9. Tom Van Fossen began employment with Allied on November 8, 1993 as Vice President and Chief Marketing Officer. Trial Tr. at 279–80 (Van Fossen). On July 1, 1996, Van Fossen became Vice President of life insurance and annuity production for the company's Property and Casualty division. *Id.* at 280. Van Fossen

resigned from Allied on April 1, 1997, though he remained on the Allied payroll until approximately late August 1997. *Id.* at 278–79.

10. Jim Van Elsen worked for Allied as Chief Actuary from February 1989 until approximately late April 1995. Trial Tr. at 548 (Van Elsen).

11. Sam Wells was President of Allied during the time frame of approximately October 1988 to October 1998. Wells Dep. at 8.

12. John Duffy began as Allied's Vice President of Finance in October 1990. Duffy Dep. at 7–8. In November 1993, Duffy became Vice President of Administration. *Id.* at 7. Both of these positions required Duffy to report directly to the President of Allied, Sam Wells. *Id.* at 10. In March 1998, Duffy became Director of Life and Marketing and began reporting directly to Rick Berg. *Id.* at 10–11.

13. During Sam Wells' tenure as President of Allied, Richard Kaufman became an officer of the company, beginning as Assistant Vice President, then moving on to become Vice President of Marketing and Sales for the Western Region. Kaufman Dep. at 6–7. Beginning October 16, 1997, Kaufman became a Regional Director for Allied. *Id.* at 5.

14. Shortly after Allied went public, in approximately January 1994, a meeting was held on the Fourth Floor of Allied. Trial Tr. at 28 (Crosser); 284 (Van Fossen); Wells Dep. at 14–15. In attendance at that meeting, among others, were Sam Wells, John Duffy, Jim Van Elsen, Wendell Crosser, Tom Van Fossen, and John Evans, a member of the Board of Di-

rectors of Allied. Wells Dep. at 15; Trial Tr. at 27–28, 32–33 (Crosser). Those in attendance at the meeting were informed that the company's short term incentive plan, fundamentally the company's executive bonus plan, would change effective January 1, 1994. *Id.*

15. The new bonus plan was to be 75% based on the company's earnings per share and 25% on company growth. Ex. 11; Trial Tr. at 30–31 (Crosser). The Threshold for the earnings per share portion of the plan was $1.50, the Goal was $1.60, and the Maximum was $1.70. *Id.* If the threshold number was not met, then the executives would not receive the profit portion of the incentive plan for the year in which the threshold was not met. Trial Tr. at 31 (Crosser).

16. Wendell Crosser testified that when he received information that the threshold number in the new bonus plan was $1.50, he already knew that the earnings per share figure for the year 1993 was $1.45, a figure $0.06 below the threshold required for the bonus plan in 1994. Trial Tr. at 40–41. Crosser also testified that approximately $100,000 of earnings to Allied in its universal line of business results in approximately a one penny increase in the company's earnings per share. Trial Tr. at 41.

17. In 1995, the threshold for earnings per share under the terms of the bonus plan increased to $1.80. Trial Tr. at 58 (Crosser).

18. After the executive meeting on the Fourth Floor in January 1994, several executives rode together in the elevator down to the first floor. Wendell Crosser testified that he does not remember riding in the elevator after the meeting or any conversation that may have taken place therein. Trial Tr. at 34. Sam Wells also testified that he did not recall whether or not he rode down in the elevator on that occasion and that he did not recall any conversation which may have occurred therein. Wells Dep. at 31–32. Tom Van Fossen, however, testified that he, Van Elsen, Duffy, Wells, Crosser and perhaps Marla Franklin rode down on the elevator after the meeting. Trial Tr. at 288. John Duffy also testified that Wells, Crosser, Van Elsen, Van Fossen, and himself were in the elevator after the meeting. Duffy Dep. at 29–30. The Court believes by a preponderance of the evidence that Wells, Van Elsen, Van Fossen, Duffy, and Crosser were present in the elevator.

19. Tom Van Fossen testified that, in the elevator, someone commented that "It's going to be really tough to reach our goal." Trial Tr. at 288. Van Fossen further testified that "goal" referred to the earnings per share and revenue numbers outlined at the Fourth Floor meeting. *Id.*

20. After exiting the elevator, Van Fossen testified that he, Crosser, Van Elsen, Duffy, Wells, and possibly McGullivrey went to Mr. Van Elsen's office and discussed raising the cost of insurance. Trial Tr. at 290. Van Fossen stated that Van Elsen said "I could probably find a way to get 5 or 6 cents a share" by raising the cost of insurance on some policies. *Id.*

21. Van Fossen testified that approximately one-half hour after the meeting in Van Elsen's office, he

had another meeting with Van Elsen regarding how a cost-of-insurance increase would impact officer bonuses. *Id.* at 293. In that meeting, Van Fossen claims that several methods were discussed regarding boosting earnings per share and the growth part of the bonus, but that mortality was never discussed. *Id.* at 293–95.

22. On January 18, 1994, an order was given to increase the cost of insurance on universal life policies by 2%. *See* Ex. 16. Due to other factors at the company, the COI increase was not actually implemented on those policies until September 1994. Trial Tr. at 54 (Crosser); 116–17 (Iverson). The 2% increase became effective on affected policies beginning in September 1994, as each individual policy reached its anniversary date. *Id.*

23. The basis for raising the COI by 2% is in dispute. Crosser testified that he believed the increase was made because of legal changes affecting the insurance industry's standards of interest maintenance reserves, asset valuation reserves, and risk based capital. Trial Tr. at 68–69. This belief was founded on Van Elsen's actuarial opinion on nonguaranteed elements that was filed with the state insurance department in February 1994. *Id.* at 69. Crosser also testified that at a regional directors meeting in 1994, Wells indicated that the COI increase was based primarily on risk-based capital. *Id.* Crosser stated that during a meeting with Wells and Van Elsen, Van Elsen told him that the 2% COI increase was based on mortality, though he admitted that the 1993 and 1994 annual reports should state whether a

COI takes place because of mortality and that the reports did not do so. *Id.* at 99–103; *see also* Ex. 16; Ex. 17.

24. From September 1994 to December 31, 1994, the 2% COI increase brought approximately $50,146 into Allied. *See* Ex. 21.

25. Crosser testified that the COI increase in 1994 had no impact on executive bonuses for the 1994 year. Trial Tr. at 72. Crosser testified that for 1995 *total compensation*, if the 2% COI had never occurred, his own compensation would have been 3% less, Van Fossen's total compensation would have been 3.2% less, and Wells' total compensation would have been reduced by 3.7%. *Id.* at 73–75, 88. Crosser testified that the impact on his *bonus* for the year 1995 was approximately 11.81%. *Id.* at 92. Crosser testified, however, that he believes the 1995 bonuses were impacted only because of an anomaly in the numbers. *Id.* at 74. No bonuses were paid in 1996 because the company failed to meet its threshold level. *Id.* at 73.

26. From January 1, 1995 to March 10, 1995, the 2% COI increase brought approximately $12,254 into Allied. *See* Ex. 21.

27. Jeanes and Mains each testified that he first learned of the 2% COI increase at a Regional Directors meeting in Des Moines, Iowa in February 1995. Trial Tr. at 180 (Jeanes), 369 (Mains). Jeanes claims that he and other regional directors at the meeting were surprised that there had been additional increases in mortality. *Id.* at 180. At the meeting, Jeanes claims he asked when the increase had

been implemented and why, but Van Fossen and other executives were unable to provide any information. *Id.* at 180–81. Shortly after the meeting, Jeanes went to speak to Van Elsen about the COI increase. *Id.* at 181. Jeanes testified that Van Elsen became upset and stated, "It wasn't all me, and, you know, it was something that I really didn't feel totally comfortable doing." *Id.* at 182–83. Jeanes further testified that Van Elsen told him that Wells had pressured him into "taking more than he felt comfortable doing." *Id.* at 183. Mains testified that a few days after the regional directors meeting, he was working with Van Fossen, Rick Berg, and Wells when the COI increase came up. *Id.* at 371. Wells reportedly said the increase was necessary and left the room and Van Fossen also indicated the increase was necessary. *Id.* at 371.

28. Crosser testified that, in early 1995, he became aware that there was emerging law regarding whether insurance companies can increase COI for reasons other than mortality if policies have language in them saying that the COI will be increased based on expectations as to future mortality experience. Trial Tr. at 51, 653.

29. In approximately April 1995, during a company trip to Paris, Jeanes testified that he asked Wells about the COI increase but that Wells refused to discuss it. *Id.* at 185.

30. After the trip to Paris, Jeanes testified that he spoke to Richard Kaufman about the increase who also was unable to provide him any information. *Id.* at 186–87. After this meeting, Jeanes essentially dropped the topic because of his inability to get his questions answered. *Id.* at 187.

31. The 2% COI increase was discontinued on April 17, 1995. *Id.* at 57 (Crosser), 118 (Iverson), 569 (Van Elsen). Had the increase not been discontinued, additional policies reaching there anniversary date would have been affected, more money would have been brought into Allied, and more impact on earnings per share would have been seen. *Id.* at 57 (Crosser). The increase in COI was "rolled back" to pre 1991 levels because of the business risk involved in continuing a 1991 8% increase and the 1994 2% increase in light of emerging law, specifically the Philadelphia Life case. Trial Tr. at. 118 (Iverson), 569–70, 572 (Van Elsen). Each impacted policy had the COI "rolled back" to pre 1991 levels on their policy anniversary date, beginning with policies with anniversary dates of April 17, 1995. *Id.* at 119 (Iverson).

32. Mains testified that about 30 days after the "roll-back," he discussed with Wells how Allied was going to put the money from the COI increase back in the affected policies. *Id.* at 372. Mains testified that Wells told him the company was not going to return the money from the COI increase. *Id.*

33. Several times between April 1995 and June 1996, Mains testified that he brought the issue of returning the COI increase money to policyholders up with executives of Allied, specifically Wells, Van Fossen, and Van Elsen. *Id.* at 373. Mains indicated that he felt two classes of policyholders had been created by the COI increase. *Id.* at 374.

Wells reportedly informed Mains that nothing Allied had done was improper and that the policy contracts allowed Allied to change mortality. *Id.*

34. On July 23, 1996, Mains wrote a letter to the Chairman of Allied's Board of Directors, John Evans, in which he indicated his belief that the COI increase had created two classes of policyholders and discussed his inability to reach a resolution regarding returning the money charged to policyholders with Sam Wells. *Id.* at 379; Ex. 22. The letter also stated, "We have had no adverse mortality to justify these increases in the cost of insurance." Ex. 22. Mains testified that he based this statement on Van Elsen's numerous comments to him that the 1994 COI increase was not based on mortality and on Sam Wells' statement that Allied had very favorable mortality with reinsurers. Trial Tr. at 380–81 (Mains). Evans did not respond to Mains' letter nor did he return Mains' phone calls. *Id.* at 383.

35. On July 29 and 30, 1996, Mains and Wells again discussed the COI issue and Wells informed Mains that the particular block of policies charged with the COI increase wasn't doing well as a whole. *Id.* at 383–84. Wells promised Mains that he would reexamine the issue of crediting money back to the policyholders and gather costs involved in such a project within 7–10 days. Ex. 23.

36. At some point in time after Wells' promise, Mains participated in a telephone conversation with Wells and Iverson who, according to Mains, told him that they didn't need to adjust anything. *Id.* at 394. Mains threatened to report the situation to the insurance commissioners. *Id.* Wells indicated that Allied could not put the money back into the individual policies because of the difficulty involved, but brought up the idea of crediting an extra five basis points to universal life policies. *Id.* at 394–96. Mains agreed. *Id.* at 396.

37. Both Jeanes and Mains testified that in June 1997, they each received a phone call from Richard Kaufman. *Id.* at 187 (Jeanes), 396 (Mains). Kaufman allegedly relayed to Mains and Jeanes a conversation he had had with Tom Van Fossen. *Id.* Kaufman reportedly told the two that Van Fossen had informed him of the fourth floor and elevator meetings and that the 2% COI increase was made for the purpose of increasing mortality to reach maximum bonus levels. *Id.* at 190 (Jeanes), 396–97 (Mains). Kaufman testified at deposition that he repeatedly tried to get information about the cost of insurance increases from Sam Wells and Jim Van Elsen, but they never responded. Kaufman Dep. at 15–18. Kaufman further testified that Jim Van Elsen told him on one occasion that "he just couldn't tell me anything, that he would lose his job if he did." *Id.* at 18. Kaufman also testified that in a conversation with Tom Van Fossen, Van Fossen told him of the Fourth Floor and elevator meetings. *Id.* at 20–21. Van Fossen reportedly told Kaufman that executives were concerned at that meeting about how to maximize bonuses and in the elevator ride, Jim Van Elsen commented that bonuses could be maximized

through a small COI increase on certain products. *Id.* at 21. Kaufman also testified that Wells told Van Elsen "to do it." *Id.* at 21; *see also* Ex. 33. Contemporaneously with his conversation with Mr. Van Fossen, which Kaufman claims took place 30–60 days before Van Fossen left the employ of Allied, Kaufman took notes of the conversation which support his testimony. Kaufman Dep. at 26; Ex. 34. Mains and Jeanes both testified at trial that they followed up on the information they received from Kaufman directly with Tom Van Fossen and that they received the same information directly from Van Fossen. Trial Tr. at 190, 202 (Jeanes), 397 (Mains).[1]

38. Tom Van Fossen testified that he did not tell Kaufman that the COI increase in 1994 was implemented to maximize executive bonuses. Trial Tr. at 332. Rather, Van Fossen testified that the COI increases were put in specifically on a block of business that had claims. *Id.* at 333. Van Fossen also testified that he told Jeanes that the COI increase was implemented to make a dead block of business more profitable and that the notion that COI was increased to maximize bonuses was ridiculous. *Id.* at 333–34. Finally, Van Fossen testified that at the time he spoke to Mr. Jeanes, he was receiving severance compensation from Allied, but was no longer employed by the company. *Id.* at 337.

39. Mains and Jeanes both testified that the information they received from Richard Kaufman was con-firmed by John Duffy in approximately June 1997. *Id.* at 191 (Jeanes), 397 (Mains). Duffy testified in deposition that in the elevator ride from the fourth floor meeting, Jim Van Elsen suggested increasing COI to gain some GAAP revenues and earnings per share. Duffy Dep. at 29. Duffy also testified that Van Elsen stated that the 2% COI increase would be a good way to help meet the goals that were set and that it would be "fairly seamless to policyholders." *Id.*

40. Mains testified that he received the name of an attorney who handled the class action lawsuit against Philadelphia Life Insurance Company, Timothy Dillon, from Mr. Kaufman during their earlier conversation. Trial Tr. at 398. Mains contacted Dillon and arranged a meeting with Dillon, Mains, and Jeanes in approximately the end of June 1997. *Id.* at 399–400. Mains procured annual statements from different Allied policies for Dillon so that Dillon could assess the situation and met with him approximately a month later. *Id.* at 400–01. During this time period, Mains alleges that Wells told him that "no officer from Allied ever gained anything from [the cost of insurance increases] financially." *Id.* at 401.

41. Mains and Jeanes sent letters of resignation to Allied on January 9, 1998. *See* Ex. 30; Ex. 31. Both testified that they believed that Allied had violated clause 3(b) of their agency agreements requiring the parties to act in "good faith" towards one another and their policy-

---

1. The Court is mindful of its decision that any testimony about what Mr. Van Fossen said after his resignation from Allied is hearsay and not admissible for the truth of the matter asserted.

holders. Trial Tr. at 204 (Jeanes), 403 (Mains).

42. Allied continued to pay Mains and Jeanes commissions after their resignations for approximately a few weeks to a few months. *Id.* at 205, 414. After that time, Allied ceased payment of commissions to both Jeanes and Mains. *Id.*

43. Allied claims that it refused to pay further commissions to Jeanes because of his failure to return materials to Allied. On March 25, 1998, Jeanes sent a letter to his attorney requesting that she communicate to Allied that he had returned or discarded all materials belonging to Allied. *See* Ex. 81. Allied responded via a letter dated April 1, 1998 stating that Jeanes still had policyholder cards, spreadsheets, software and reports. *See* Ex. 83. Additionally, Allied expressed concern over Jeanes' involvement with pending litigation against Allied and over his alleged involvement with the surrender of an Allied insurance policy. *See* Ex. 83. Jeanes denied possession of any Allied materials and denied involvement in any negative information about Allied in a letter dated April 2, 1998. *See* Ex. 84.

44. Allied alleges that it refused to pay further commissions to Mains for substantially the same reasons that it refused to pay Jeanes, i.e., failure to return materials, encouraging replacement of Allied policies, and involvement with pending litigation. Trial Tr. at 415–17. Mains also corresponded with Allied through counsel to indicate that he did not have any materials belonging to Allied, nor had he ever encouraged replacement of Allied policies. *Id.* at 416–17; *see also* Ex. 82.

45. Allied claims that Mains and Jeanes "encouraged" policyholders to replace Allied policies through newsletters sent out by their private firms. In one example, Jeanes states in a newsletter, "Some companies raised mortality costs and never bothered to inform policyholders of this action. We refuse to promote carriers that have engaged in this practice. . . ." Ex. 101. In a newsletter from Mains was a brief article indicating that Mains had resigned from Allied and that a class action suit was filed against Allied on January 20, 1998. Ex. 101. Mains and Jeanes deny ever having encouraged any Allied policyholder to replace their policies with those from another company.

46. Despite repeated correspondence between the parties, Allied never "turned-on" Mains' and Jeanes' commissions. Mains and Jeanes both allege, however, that Allied offered to resume payment of their commissions if they would drop their lawsuits against Allied. *Id.* at 214; *see* Ex. 89.

47. Allied ceased selling new life insurance policies on July 9, 1999, because of the sale of Allied to a company called Swiss Re. *See* Trial Tr. at 22.

48. On October 1, 1999, Computer Science Services took over as administrator of Allied Life policies and also assumed responsibility for regional directors' commission statements. Trial Tr. 600–01.

49. Just prior to trial, on June 14, 2001, Reassure America Life Insurance Company, the company which Allied merged into, issued a check for

$82,565.94 to Wayne Mains for payment of past commissions. *See* Ex. 106. A check was issued to Shawn Jeanes on the same day for $56,425.16 for past commissions. *See* Ex. 107. A second check was issued to Shawn Jeanes on June 14, 2001 for $3871.36. *See* Ex. 108.

### III. CONCLUSIONS OF LAW

*A. Plaintiffs' First Cause of Action: Breach of Contract and Plaintiff Mains' Fifth Cause of Action: Breach of Insurance Policy Contracts*

Mains and Jeanes first allege that Allied breached the terms and provisions of their agency agreements by failing to act in good faith relative to policy holders by substantially adjusting the cost of insurance rates of life insurance policies from 1991 to the present when the adjustment did not relate to any change in the mortality experience of Allied. Rather, Plaintiffs allege, Allied adjusted the cost of insurance to generate additional revenue for the company so that executives of Allied could maximize their bonuses. Plaintiffs claim that raising the cost of insurance for a reason other than a true change in the overall mortality experience of the company violates express language in many policies that the "[m]onthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience." *See* Ex. 4, p. 9; Ex. 5, p. 7; Ex. 6, p. 7. Plaintiffs further claim that Allied made no effort to reveal the cost of insurance increase to its policyholders, that it intentionally concealed the increase from its policyholders and Regional Directors, and that it intentionally concealed the true reasons for implementing the increase.

Plaintiff Mains, individually, contends that Allied breached his insurance policy contracts by raising the cost of insurance by 2% in 1994 in direct violation of a provision in life insurance policies that he holds which reads as follows:

> Cost of Insurance Rate. The Cost of Insurance Rate is based on the sex, attained age and rate class of the Insured. Attained age means age on the prior Policy Anniversary. Monthly cost of insurance rates will be determined by us *based on our expectations as to future mortality experience.* However, the cost of insurance rates will not be greater than those shown in the Cost of Insurance Rate Table. Any change in the Cost of Insurance Rate Table will apply uniformly to all members of the same class.

*See e.g.* Ex. 4, p. 9; Ex. 5, p. 7; Ex. 6, p. 7 (emphasis added). Because the two Counts of the Complaint are substantially related in the Court's analysis, the Court will first address the issue of whether Allied breached its insurance contract with Mr. Mains. The Court will then consider Plaintiffs' claims that Allied breached the terms of their Agency Contracts.

To establish a breach of contract action in Iowa, "the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach. A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 224 (Iowa 1998) (citations omitted).

#### 1. Breach of insurance policy contracts

With regards to Mr. Mains' personal insurance policy contracts with Allied, there is no dispute that the first three

elements required to prove breach of contract have been satisfied. Mains had valid universal life insurance policies with Allied, all with virtually identical terms. The terms and conditions of those contracts are laid out within the four corners of the contracts and Mains has done what he is required to do under the contracts. The question for the Court to consider, then, is whether the provision of the contract stating "[m]onthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience" precluded Allied from raising the cost of insurance for reasons other than its expectations as to future mortality experience.

■ Under Iowa law, a primary principle of interpretation of insurance contracts is that the language of the insurance contract "must be given its common and ordinary meaning and must be construed as popularly understood." *Langlas v. Iowa Life Ins.*, 245 Iowa 713, 63 N.W.2d 885, 887 (Iowa 1954). When the language in an insurance contract is equivocal or ambiguous, the rules of contract interpretation require the court to construe the language strictly against the insurer and in favor of the insured. *Id.* (citing *Walters v. Mutual Benefit Health & Accident Association*, 208 Iowa 894, 224 N.W. 494, 496 (Iowa 1929)). The latter rule will only be brought into play if the intent of the parties is not clear when the contract is viewed as a whole or if there are conflicting terms within the contract. *Id.*

■ Several executives of Allied testified at trial that they believed that the cost of insurance could be increased for any reason, and that the company was not limited to increasing the cost of insurance only for changes in expectations of mortality. Sam Wells testified that he believed Allied was allowed to increase the cost of insurance, in policies containing the language cited above, for reasons including solvency, capital and surplus issues, and

for mortality. *See* Wells Dep. at 89–90. Allied states in its closing argument that "the life insurance industry in general believed that the COI on universal life policies could be increased for reasons other than mortality" and that Allied "had no basis for believing it could not make the COI increases for DAC tax and Risk Based Capital reasons." Def.s Closing Arg. at 6. Yet, the plain language of the policies appears to provide no basis for increases in the cost of insurance other than increases due to expectations of future mortality. There is no language included in the above portion of the policy indicating that expectations of future mortality are merely one factor upon which a cost of insurance increase may be founded. The mere fact that it was generally accepted policy in the insurance industry to raise COI in universal life policies for a multitude of reasons is not conclusive. Rather, as with any contract, the plain language of the contract governs the rights and responsibilities of the parties under the contract.

The Court can find no other language in the policy which even presents the possibility that Allied can change the cost of insurance for reasons other than mortality experience. Thus, there are no conflicting terms which this court must interpret and there is no ambiguity about the way that the contested term is phrased. Here, the plain language of the contract only allows Allied to change the cost of insurance for increases in the companies expectations as to future mortality.

Having found that the policy language cited is unambiguous and acted to restrict Allied from increasing the COI for reasons other than changes in expectations of future mortality, the Court must now turn to the issue of whether the 1994 2% COI increase was based on an expected increase in mortality or whether the increase

was made for other reasons. Allegations have been made at trial that the COI increase was implemented to increase executive bonuses. Several Allied executives vehemently deny this allegation. Sam Wells specifically testified that he told regional directors at an annual meeting that Allied was "going to have a 2 percent increase and it was related to risk-based capital and surplus concerns." Wells Dep. at 106. Wendell Crosser testified that he believed the 2% increase was implemented because of changes in 1993 dealing with interest maintenance reserves, asset valuation reserves, and risk-based capital. Trial Tr. at 68–69. Tom Van Fossen testified that he believed the COI increase was implemented to make a dead block of business more profitable. *Id.* at 333. Jim Van Elsen testified that he believed the COI increase was implemented to ensure that new risk-based capital requirements were met. *Id.* at 588.

On the other hand, there was also testimony at trial that if a COI increase based on mortality was made, it should have been reflected in Van Elsen's actuarial opinions filed with the state insurance regulators. *Id.* at 100–101. No mention of mortality appeared in that document. *See* Ex. 16. John Duffy testified that he was convinced the increase was made to maximize executive bonuses and not for any actual increase in mortality. *See generally* Duffy Dep. at 28–32. Don Iverson testified that Van Elsen specifically told him at one point that no changes in mortality had occurred. Trial Tr. at 139. Iverson was not even asked to do a study regarding increases in mortality until approximately March of 1995, a full six months after the COI increase had already been put in place, and notably after word had spread that a class action suit was to be filed against Allied. Trial Tr. at 135. Iverson also testified that Wells asked him to review the mortality study after the class action suit was filed and appeared to find justification to say the 1994 increase was due to mortality once Iverson presented him with results indicating that there had, in fact, been an increase in mortality. *Id.* at 136–37.

Significantly, the Court believes that Allied presented very little evidence that the 1994 2% COI increase was related solely to mortality as the cited policy contract language dictates. Indeed, it is troubling that with only five or so executives making the determination that a COI increase should be implemented, each seems to have a different understanding of precisely what the reasons for the increase were. One executive's statement that the increase was made for mortality was, at every turn, countered by another executive's statement that the increase was made to increase earnings per share or GAAP revenue, or that the increase was made to cover reserves and risk-based capital requirements under new legislation, or even that the increase was made to maximize executive bonuses. The Court found much of the testimony of executives of Allied who participated in the 2% COI increase to be evasive and quite uncooperative with efforts to determine the true nature of the increase.

The Court is convinced by a preponderance of the evidence that the 1994 2% COI increase was not implemented solely for reasons of an increased company expectation of mortality. As such, this violates a specific provision of the terms of Mr. Mains universal life policies. Accordingly, the Court believes that Allied breached the provisions of Mr. Mains' insurance policy contracts. Mr. Mains seeks an award of $485.84 plus prejudgment and prefiling interest. However, the Court is convinced that Mr. Mains waived his right to recovery for breach of the terms of his insurance policy when he verbally accepted Mr. Wells' offer to increase the interest

rate on affected policies by five basis points. The evidence supports the conclusion that, because Mr. Mains' policy was affected by the 2% increase, it was also credited with the five basis point adjustment. Because Mr. Mains agreed to this adjustment as an adequate way to compensate policyholders for the wrongful increase, the Court does not believe an award of damages is appropriate.

### 2. Mains' and Jeanes' Breach of Contract Claim

Plaintiffs allege a breach of their Agency Agreements with Allied life insurance. While both Plaintiffs had entered into several such agreements, the specific contracts sued on are: the Agreement Mr. Mains signed on August 22, 1994 and the Agreement Mr. Jeanes signed on May 23, 1996. *See* Ex. 1; Ex. 2. Mains and Jeanes rely on a provision present in each of their contracts to make their claim for breach of contract. That provision is encompassed in paragraph (3)(b) which reads:

> Good Faith. Both parties will, at all times, act in good faith when dealing with our policyholders and each other. You will not make any actions that suggest or encourage any policyholder to surrender or lapse any policy or to cease premium payments. Any such activity gives us the right to terminate this Agreement for cause.

The parties do not dispute that a contract was formed between Wayne Mains and Allied Life on August 22, 1994. *See* Ex. 1. Nor do the parties dispute that a contract was formed between Shawn Jeanes and Allied on May 23, 1996. *See* Ex. 2. There is also no dispute that each contract required the parties to act in good faith in dealing with policyholders and with one another. *See* Ex. 1, para. 3(b); Ex. 2, para. 3(b). There has also been no argument that either Jeanes or Mains were negligent in the performance of their duties under the terms of the contract up

to the date of their resignations, January 9, 1998. There is, however, significant dispute over the fourth element required to prove a breach of contract claim, i.e., whether Allied breached its contracts with Jeanes and Mains in some particular way.

Plaintiffs argue that Allied clearly violated the good faith clause in their contracts in several ways. Specifically, Plaintiffs argue that Allied: 1) raised the COI by 2% to maximize executive bonuses; 2) raised the COI by 2% for reasons other than "expectations of mortality"; 3) hid the increases from the policyholders; 4) hid the truth about the increases from the Regional Directors of Allied; and 5) engaged in a course of conduct intended to materially misrepresent the truth behind the reasons for the 2% COI increase. *See* Pl.'s Closing Arg. at 19.

Defendant argues that Plaintiffs cannot prove that any alleged breach of contract occurred during the existence of their 1994 and 1996 agency agreements. "Any alleged bad faith conduct occurring *before* Plaintiffs executed their 1994 and 1996 Agreements is irrelevant to Plaintiffs' breach of contract claims because neither party had an obligation at that time to perform under the 1994 and 1996 Agreements." Def.'s Closing Arg. at 3. Thus, Defendant believes that Plaintiffs' claim for breach of contract must fail. The Court disagrees with Defendant's reasoning.

As a preliminary matter, Defendant's reasoning simply cannot be applicable to Plaintiff Mains. Mains entered into his renewal contract with Allied on August 22, 1994. While a decision was made as early as January 1994 to increase the cost of insurance, testimony at trial clearly revealed that the COI increase was not actually implemented until September 1994. Thus, even assuming the breach of contract could only have occurred at the mo-

ment the 2% increase was implemented, such a breach would still have occurred *after* Mr. Mains entered into his contract with Allied.

The Court does not, however, believe that breach of contract could only have occurred at the precise moment the 2% COI increase was implemented. As the Court noted in its ruling on Defendant's motion for summary judgment, there is some evidence in the record indicating that Mains and Jeanes did not learn the true nature or extent of the increase in the COI until approximately June 1997, when they received phone calls from Richard Kaufman disclosing information he had allegedly learned from Allied executive Tom Van Fossen. It is clear that Mr. Mains believed as early as July 23, 1996 that the increase was not made because of an increase in mortality.[2] *See* Ex. 22 ("We have had no adverse mortality to justify these increases in the cost of insurance.") However, the record indicates that, while Mains and Jeanes were suspicious of the circumstances surrounding the increase, they did not actually suspect until 1997 that the increase was made in an effort to maximize executive bonuses. The duty of good faith encompassed in the 1994 and 1996 contracts could have been breached by an ongoing effort by Allied to deceive its policyholders, Mains, and Jeanes regarding the actual circumstances surrounding the COI increase. Jeanes and Mains mere knowledge that a COI increase had taken place does not preclude them from going forth on their claims that the good faith provision of their agency contracts was violated by Allied's deception.

■ The Court now turns to the specific question of whether Allied breached the Good Faith provision of its Agency Agree-

ments with Mr. Jeanes and Mr. Mains by attempting to cover-up the fact that an increase in the COI was made as well as the true reasons for the increase. Evidence was relatively overwhelming at trial that Allied made no effort to notify policyholders that a COI increase had taken place. Duffy testified that there was absolutely nothing in the policyholders annual statements that would indicate that COI had increased or by how much. *See* Duffy Dep. at 61. Van Elsen also confirmed that policyholders were not notified. Trial Tr. at 9. There was even testimony that when Van Elsen mentioned the COI increase to the other executives in the elevator, that he stated "it would be fairly seamless to the policyholders." Duffy Dep. at 29.

Even Regional Directors did not know that a COI increase had occurred in September of 1994 until the Regional Director's meeting in February 1995. There was ample testimony from Jeanes, Mains, and Kaufman that when they inquired as to precisely why the increase was imposed they were given no information, were told it was "none of their business" or were otherwise stonewalled. As noted, both Jeanes and Mains suspected that there had been no actual increase in Allied's expectations of mortality, yet neither admits to suspecting a plan by the executives to raise the COI solely to maximize their bonuses until each spoke to Richard Kaufman in June 1997. Mains and Jeanes took some time to confirm in their own minds the information Kaufman had given them, both with Duffy and with Van Fossen himself. Each resigned on January 9, 1998, allegedly in protest over Allied's actions. There is no dispute in the record that Mains and Jeanes did not resign immediately upon learning of the alleged wrong-

---

2. The Court notes that this is still well after the date on which Mr. Mains entered into his

Regional Director Agreement.

doing of Allied, nor is there any dispute that each stayed with Allied until a point in time after they received their bonuses for the year 1997.

The Court believes, by a preponderance of the evidence, that Allied breached its contract with both Mr. Mains and Mr. Jeanes by failing to act in good faith towards its policyholders and towards Mr. Mains and Mr. Jeanes. Specifically, the Court finds convincing the testimony that an elevator meeting did take place with Wells, Van Fossen, Van Elsen, Duffy, and Crosser. The Court believes that discussion was had and a decision was ultimately made to increase the cost of insurance for reasons other than an increase in mortality expectations. What's more, the Court believes the testimony at trial is clear that Allied did not reveal reasons for the cost of insurance increase to its regional directors or to its policyholders.

Good faith is sometimes characterized as "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. . . ." *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 34 (Iowa 1982). Good faith "excludes a variety of types of conduct characterized . . . as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Id.* (citing Restatement (Second) of Contracts § 205, comment a (1981)). In this case, good faith would certainly include an obligation on the behalf of Allied to make changes in the cost of insurance known to its policyholders. Good faith would also encompass an obligation by Allied to be honest with its Regional Directors so that they are able to be honest with the company's clientele. It is clear from the record now before the Court that Allied did not raise the COI for morality experience. It is also clear that the true reason for the increase, be it to maximize executive bonuses or to cover new legislative require-

ments, was not revealed and was not made known to policyholders and to Messrs. Jeanes and Mains. The Court is convinced that such behavior by Allied "violate[s] community standards of decency, fairness or reasonableness." *Id.*

■ Because testimony has shown by a preponderance of the evidence that Allied breached the Good Faith provision of Jeanes and Mains agency agreements, the Court must now turn to the issue of whether Jeanes and Mains were damaged by Allied breach of the good faith provision of their agreements. Jeanes and Mains claim that when they learned that Allied allegedly raised the cost of insurance to maximize executive bonuses, they quit in protest. Plaintiffs allege they were constructively discharged because they could no longer, in good conscience, continue to work for and represent a company that is deceptive with its employees and clientele. Defendant, on the other hand, argues that Plaintiffs resignations were calculated solely to put them in the best possible legal position. Defendant argues that Plaintiffs have failed to prove they resigned because of the 2% increase. Rather, Allied urges the Court to consider several facts: Mains and Jeanes had both complained to Allied executives, including Board of Directors members in the past, but did not do so on this occasion, their resignation letters failed to refer to the COI increase, both were concerned about the security of their positions with Allied after it went public, and both waited until after they received their 1997 bonus to resign.

The Iowa Supreme Court has held that a "[c]onstructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Haberer v. Woodbury County*, 560 N.W.2d 571, 575 (Iowa 1997) (citing

*First Judicial Dist. Dep't v. Iowa Civil Rights Comm'n,* 315 N.W.2d 83, 87 (Iowa 1982)). The intent requirement is satisfied by showing the plaintiff's quitting was a "reasonably foreseeable consequence of the employer's ... actions." *Ayers v. Food & Drink, Inc.,* 2000 WL 1298731 at *4 (Iowa Ct.App.2000) (citing *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1247 (8th Cir.1998). "The test for constructive discharge is objective: The fact-finder must conclude that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's position would be compelled to resign.'" *Haberer,* 560 N.W.2d at 576–76 (quoting *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980)). The *Haberer* Court described the standard this way:

> Under the cases, an employee cannot simply "quit and sue," claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee. An employee may not be unreasonably sensitive to his or her working environment.... Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work.... [An employee is not] guaranteed a working environment free of stress. In order to amount to a constructive discharge, adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable. In general, single, trivial, or isolated acts of [misconduct] are insufficient to support a constructive discharge claim.

*Id.* (citing with approval *Turner v. Anheuser Busch, Inc.,* 876 P.2d 1022, 32 Cal. Rptr.2d 223 (1994) (en banc) (overruled on other grounds)).

Based on the testimony and evidence adduced at trial, the Court believes that Jeanes and Mains were constructively discharged. From the time that Mains and Jeanes found out about the increase at the Regional Director's meeting in February 1995 to the time that they received information that the increase was made to maximize executive bonuses, each tried to no avail to find out information regarding the increase and each forcefully expressed his opinion that the increase was inappropriate. After two and a half years of futile efforts to determine the reasons for the increase and after voicing concerns to company executives that policyholders were being treated unfairly, Mains and Jeanes reached the conclusion that the company for which they had worked for many years was not an honest and reliable one. The Court believes that, regardless of its reasons for increasing the cost of insurance, Allied reasonably should have known that giving Regional Director's "the runaround" on important company issues for an extended period of time would likely result in distrust and suspicion. A reasonable person in the shoes of Messrs. Mains and Jeanes would have every reason to think the worst, in light of Allied's lack of forthcomingness. A reasonable person would also likely feel compelled to resign if placed in the same situation as Jeanes and Mains.

The fact that Mains and Jeanes waited for approximately six months before resigning after receiving information that the increase was made to maximize executive bonuses before resignation is not determinative. Mains and Jeanes had worked for many months in 1997 to earn their bonuses and the Court declines to punish them for ensuring their financial stability before

terminating their employment with Allied. Additionally, Plaintiffs did make some effort during that time to find out more information and to determine whether or not their suspicions were true. The decision to leave a company after many years of employment is not an easy one and the Court does not believe that a six-month delay was an unreasonable amount of time to delay resignation under the circumstances.

Defendant relies heavily on the fact that Plaintiffs did not mention the COI increase in their letter of resignation to support its claim that Plaintiffs did not resign because of the COI increase. Jeanes' resignation letter stated, "Based on unresolved issues relating to Allied Life's treatment of in-force cash value policies and other disturbing information which has also come to my attention, I can no longer represent Allied Life in good conscience." Ex. 30. Mains' resignation letter stated, "I have brought into question several issues and sought resolution to no avail. Recently other information has become available which has caused me to have new concerns about Senior Managements' standards for operation." In light of Mains' and Jeanes' repeated inquiries over the nearly three years prior to their resignations, the Court believes it is clear that the new information each refers to is the information received from Richard Kaufman that the COI increase was made to maximize executive bonuses. The letters must be viewed in context, not as independent statements. Thus, the mere failure of Jeanes and Mains to mention the COI increase specifically is not fatal to their claims of constructive discharge.

Mains and Jeanes both had worked for Allied for many years as Regional Directors. While they conducted business with other companies, Allied represented the vast majority of each Plaintiffs' income. The Court is convinced that Mains and Jeanes resigned from Allied because they simply felt they could not continue to represent a company they believed had lied to and cheated its policyholders. Allied's course of conduct in dealing with Mains and Jeanes regarding the COI increase was deceptive and inappropriate. Any reasonable person in the shoes of Mains and Jeanes would likely have felt compelled to resign in light of the circumstances rather than continue to represent a company that had been dishonest. Additionally, the Court believes the testimony of Mains and Jeanes that the decision to leave Allied was a difficult one. Plaintiffs were making outstanding money in their relationship with Allied, they had built strong relationships with agents and policyholders alike, and they simply could not risk their own good names and integrity by continuing to represent Allied in the circumstances. It is not unreasonable to believe that Allied should reasonably have foreseen that a consequence of their treatment of policyholders and Regional Directors would result in the severance of some of those relationships. Thus, the requirement that Allied have intent is satisfied because Plaintiffs' resignation was a "reasonably foreseeable consequence of the employer's ... actions." *Ayers,* 2000 WL 1298731, at *4.

Having found that Allied breached Plaintiffs' agency agreements and that Plaintiffs were justified in their resignations under the doctrine of constructive discharge, the Court believes that the fourth and fifth elements necessary for Plaintiffs to succeed on their claim for breach of contract have been satisfied. Therefore, the Court believes judgment should be entered in favor of Plaintiffs on Count One: Breach of Contract.

### 3. *Damages for Breach of Contract*

The case of *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.,* 579 N.W.2d 823 (Iowa 1998) sets forth the proper frame-

work for analyzing damages available upon breach of a contract.

Under Iowa law, when a contract has been breached the nonbreaching party is generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed. *Magnusson*, 560 N.W.2d at 27; *see also* Restatement (Second) of Contracts § 344(a) (1979); 22 Am.Jur.2d Damages § 43 (1988). This type of damages is sometimes referred to as the injured party's "expectation interest" or "benefit of the bargain" damages. *Magnusson*, 560 N.W.2d at 27 (citing 22 Am.Jur.2d Damages § 45). Under this theory of damages, the nonbreaching party's recovery "is limited to the loss he has actually suffered by reason of the breach; he is not entitled to be placed in a better position than he would have been in if the contract had not been broken." 22 Am.Jur.2d Damages § 45 (1988) (emphasis added).

In determining the amount of damages, we must also be mindful that "the measure of damages recoverable for a breach of contract in each case must have relation to the nature and purpose of the contract itself, as viewed in connection with the character and extent of the injury." *Id.* § 44. In addition, courts must also consider the foreseeability of damages. In *Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994), we stated: [D]amages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement.... Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded.

*Id.* at 831.

 Plaintiffs request an award of damages for commissions and overrides they would have received had they not been constructively discharged from their positions with Allied. Defendant argues that the contract provides the only measure of damages allowable upon breach and that an award for lost profits would be inappropriate. As the Court stated in its June 25, 2001 Order on Summary Judgment Motions:

After considering the matter, the Court finds that Plaintiffs' request for future commissions is a proper measure of damages for breach of contract in this case. Contrary to the Defendant's assertion, the respective employment agreements do not state the remedies available to Plaintiffs in the event of the company's breach. True, there is a provision respecting the parties' rights upon termination. *See* Para. 3e ("Effect of termination" clause) (the "agency relationship" as well as all prior agreements or arrangements are terminated). And there is language covering the company's rights upon the agent's breach. *See* Para.3d. But nowhere in these employment agreements is there a statement respecting the Plaintiffs' rights on the company's breach.

Order (# 159) at 10–11. The Court stands by its decision regarding the appropriate measure of damages. Under the reasoning in *Midland*, the Court believes that loss of future commissions are damages that a reasonable person would expect to follow from breach of this sort of employment contract.

The Court's calculation of damages in this matter has been a very complex process. The Court has carefully reviewed the testimony of Plaintiffs' expert witness, Scott Mowry, and of Defendant's expert witness, Cyrill Mandelbaum. The Court has also carefully reviewed all supporting documentation presented at trial. Defendant points out in its closing argument

that, "Plaintiffs seek to present a measure of damages beyond the contract. This is simply inappropriate under Iowa law." The Court also notes that the calculations of Ms. Mandelbaum are premised on her opinion that "the rights of the parties should be determined by [their agency] agreements." Trial Tr. at 624. In light of the Court's June 25, 2001 ruling that the agency agreements do not provide an indication of the rights of Plaintiffs upon Allied's breach, calculating damages on such a premise was a very risky course of conduct. The parties in this matter should be well aware that a determination of the rights and obligations of contract parties is a matter for the Court to determine at trial. Yet, Defendant still relies on its expert's conclusion that, based upon her review of the contracts, Mains and Jeanes "were not entitled to lost profits beyond the time that they terminated." Trial Tr. at 625.

In this matter, the Court concluded some months ago, and has reaffirmed its conclusion, that the contract sued upon in this matter made no provision for the rights of Plaintiffs should the company breach the agreement. Therefore, in accordance with normal calculations of damages under Iowa law, Plaintiffs are entitled to be placed in as good a position as they would have been if the contracts had been fully performed. Consistent with that is a measure of damages including lost profits. The only question before the Court on the damages issue is whether Plaintiffs have adequately proven future profits. Defendant argues and its expert testified that future profits are too speculative to be awarded. The Court believes that the long-ago observations of the Iowa Supreme Court bear repeating:

A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain. It is not true that loss of profits cannot be allowed as damages for a breach of contract. Losses sustained and gains prevented are proper elements of damage. Most contracts are entered into with the view to future profits, and such profits are in the contemplation of the parties, and, so far as they can be properly proved, they may form the measure of damage. As they are prospective, they must, to some extent, be uncertain and problematical, and yet on that account a person complaining of breach of contract is not to be deprived of all remedy. It is usually his right to prove the nature of his contract, the circumstances surrounding and following its breach, and the consequences naturally and plainly traceable to it; and then it is for the jury, under proper instructions as to the rules of damages, to determine the compensation to be awarded for the breach.

*Hirschhorn v. Bradley,* 117 Iowa 130, 90 N.W. 592, 596 (Iowa 1902).

The Court will now evaluate the testimony offered by Plaintiffs regarding their alleged lost profits stemming from Allied's breach of contract and their constructive discharge. Mowry calculated Mains' and Jeanes' projected income for 1998 through July 31, 2000 using their average growth rates for 1993–1997. Trial Tr. at 498.

Defendant first objects to the inclusion by Mowry of any commission amounts paid to Plaintiffs prior to trial. Mowry himself agreed that such amounts would need to be deducted from his analysis. Trial Tr. at 517. The Court agrees that because the analysis period offered by Mr. Mowry includes 1998, any commissions actually paid by Allied would need to be subtracted from the total estimated lost profits should the Court adopt the analysis of Mr. Mowry.

Defendant next objects to Mowry's inclusion of service fees and bonuses in his

analysis. According to Defendant, service fees were not payable for any reason upon termination. The agency agreements provide, "Service Fees are not vested and will not be paid on premiums received subsequent to the termination of this agreement." Ex. 1 at 2; Ex. 2 at 2. Having found that Allied breached Mains' and Jeanes' agency agreements and that Plaintiffs were constructively discharged, however, the Court believes that it is appropriate to grant Plaintiffs appropriate expectation interests. "Expectation interest" allows the Court to place "the promisee in as good a position as if the contract had been fully performed." *Potter v. Oster*, 426 N.W.2d 148, 150 (Iowa 1988) (citing Restatement (Second) of Contracts § 344 (1979); E. Farnsworth, Contracts § 12.1, at 811–15 (1982)). Had Plaintiffs not been constructively discharged, they would have continued to receive service fees and potentially bonuses under the terms of the contract and the Court believes the inclusion of service fees and realistic bonuses in the overall calculation of damages is not inappropriate.

Defendant also argues that Mowry ignores the fact that the agreements were terminable at will upon 30 days notice. "This set the bargained—for contractual limitation of future damages flowing under the agreements at one month and not two and one half years as projected by Mowry." Def.'s Closing Arg. At 26. The Court finds this argument to be without merit. Defendant appears to liken Plaintiffs in this matter to at-will employees. The mere fact that the contract could have been terminated on 30 days notice, however, does not preclude this Court from awarding future damages:

> The biggest problem in awarding future damages for the wrongful discharge of an at-will employee is avoiding speculation. With no contract for guidance, it is often difficult, if not impossible, to know how long the employee would have

continued to work for the employer. It is well established, however, that "while recovery will be denied if it is speculative and uncertain whether damage has been sustained, recovery will not be denied merely because the amount of damages is difficult to ascertain." *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562 (Iowa 1987). Future damages in this context are very similar to the award of "front pay" in employment discrimination actions. In *Whittlesey v. Union Carbide Corp.*, the court stated:

> while we agree that an award of future damages carries with it some risk of uncertainty and may, indeed, be speculative in some cases, we do not believe the risk to be so great as to preclude automatically front pay in every case. 742 F.2d at 728. As the Whittlesey court pointed out, preclusion of future damages "would permit the defendant's liability for its unlawful action to end at the time of judgment." *Id.*

*Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 688 (Iowa 1990). The *Smith* Court found that an at-will employee could receive future damages if he could establish that he would have continued his employment for a period of time after termination. In this case, Plaintiff Jeanes had worked for Allied for approximately ten years. Plaintiff Mains had worked for Allied for approximately 17½ years. Plaintiffs have both testified that they would have continued their employment with Allied were it not for what they perceived to be Allied's wrongful conduct. Allied has presented no evidence that it would have exercised the thirty day termination without cause provision of the agency agreements in the time period for which Plaintiffs seek damages. Therefore, the Court believes that the mere fact that Plaintiffs could have been terminated without cause is not determinative. Rather, the Court believes that Plaintiffs have adequately

demonstrated that their employment would have continued with Allied until at least July 1999 when the company ceased selling new policies.

Allied's next criticism of Mowry's analysis is that it includes a projection for lost commissions beyond the date when Allied ceased selling new insurance policies in July 1999. Mowry, Defendant claims, "projected gross income through July 31, 2000 as if the first year commissions, bonuses and service fees would go on through the end of 1999 basically unabated from the historical income stream." Def.'s Closing Arg. at 28. Mowry testified that he carried his projection forward for approximately one year after the time when Allied ceased selling new policies because "there would have . . . been premiums that would have been earned in the ensuing year even though no new applications had been taken . . . [a]nd it was agreed that the date of July 31st, 2000, would be a representative period after the cut-off date for new applications that would be reasonable to expect they wold have gotten income." Trial Tr. at 495. Cyrill Mandelbaum, on cross examination admitted that if Jeanes and Mains had sold policies in June 1999, they may have gotten paid additional first year commissions beyond the July 1999 cut-off date. Trial Tr. at 639–40. The Court believes that Plaintiffs have adequately accounted for the cessation of new business by Allied in July of 1999. While the losses were carried forward in Mowry's analysis for approximately one year, commissions could well have continued into the future for a substantial period of time due to the fact that commission payments continue as long as policyholders continue to make payments on a policy. The Court believes that a one-year extension from the time that Allied ceased selling new policies is a reasonable way to balance out commissions that would accrue beyond the one-year extension while still accounting for premiums upon which commissions would be paid during that one-year period.

Defendant also criticizes Mowry's application of a 26–29% growth rate for Defendant's income over the years following their cessation of employment with Allied. Cyrill Mandelbaum testified that such a growth rate is not sustainable and therefore, should not be used. However, Mowry's calculations were based on an actual projected growth rate based on Jeanes' and Mains' actual earnings and growth rates with Allied from 1993–1997. On cross-examination, Mandelbaum admitted that on average from 1993 to 1997, Mains and Jeanes sustained larger than average growth rates. Trial Tr. at 634. Mandelbaum's method, by contrast, "took an average of the last five years and said that the year after [Jeanes] resigned from Allied, his income was higher than his average; therefore, he has no damages." The Court is convinced that Mowry's projection approach is the method more likely to accurately reflect Plaintiffs' damages in this matter.

The fact of the matter is, that while Plaintiff's are claiming an incredibly large amount of future damages, their claims are supported by their historical earnings. Every criticism Mandelbaum offers of Mowry's projections was well-explained and countered by counsel on cross-examination. The Court does not believe that Mowry's projections are too speculative to stand and further finds that his projections are scientifically and mathematically well-founded. Ms. Mandelbaum's opinion as to damages is based on the unfounded presumption that the Court would change its prior determination as to the appropriate measure of damages. As such, it offers little guidance to the Court as an independent measure of damages, though the criticisms offered by Ms. Mandelbaum were

carefully considered by this Court in reaching its conclusion.

In accordance with Mr. Mowry's expert opinion, the Court believes that Plaintiff's have adequately proven their lost profits. While the Court concedes that the award seems quite large, the numbers, after careful consideration, do seem to be in accord with the historical earnings of Plaintiffs. The Court, therefore, finds that Plaintiff Jeanes has shown that his total lost profits due to Allied's breach of contract total $884,474.00. Because Jeanes already received commission payments in the amount of $68,791.16, Plaintiffs Jeanes total lost profits total $815,682.84. Plaintiff Mains lost profits resulting from Allied's breach total $935,387.00, less commission amounts paid to him of $87,265.20, for total lost profits of $848,121.80.[3]

■ A final determination the Court must make before commencing to award damages is whether Plaintiffs adequately mitigated their damages. Jeanes testified that immediately upon his resignation, he was "trying to get referrals and meet agents." Trial Tr. at 218. Mains testified that he "[w]ent out with the carriers we had, we tried to recruit different agents ... called on property and casualty agencies of Allied that continued to do business with us. We promoted our business and our products through every means that we could as far as territory, the normal distance we worked from our present place in Rosevelt." Trial Tr. at 431. Evidence indicates that while both Jeanes and Mains lost significant profits in 1998 and 1999, their income was beginning to "bounceback" by the year 2000. Considering that Allied accounted for approximately 80% of

Mains' total income and approximately 60% of Jeanes' total income, the Court believes that Plaintiffs took significant steps to replace the income lost from Allied. The Court is not convinced, however, that Jeanes and Mains took all steps possible to mitigate their damages. Other than general statements and numbers that counsel appears to urge should speak for themselves, Jeanes and Mains have provided little specific evidence of their efforts to mitigate damages. The burden of proving that Plaintiffs failed to mitigate damages lies with Allied. *See generally Knauss v. City of Des Moines*, 357 N.W.2d 573, 576 (Iowa 1984). While Allied certainly could have presented this Court with far more evidence that Plaintiffs failed to mitigate damages than it did, the Court does believe that Allied has carried its burden on this issue, if only to a small degree. Additionally, the Court believes that Mowry included in his calculations bonus payments for the years 1999 and 2000 when no bonuses were actually paid in those years because of Allied's cessation of further policy sales. Therefore, the Court will remit the total lost profit amounts of each Plaintiff by 30%, an amount the Court believes is commensurate with their mitigation efforts and which will reasonably discount the inclusion of bonus awards for 1999 and 2000. *See generally* Ex. 109.

Accordingly, it is the order of the Court that Plaintiff Mains is hereby awarded damages for breach of contract in the amount of $593,685.26. Plaintiff Jeanes is hereby awarded damages for breach of contract in the amount of $570,977.99. Plaintiffs urge the Court to award pre-

---

3. Plaintiffs' closing argument states that Jeanes has received $68,791.16 and Mains has received $87,265.20. These numbers are different from the totals the Court calculates using Exhibits 106–08. Because these are the numbers urged by Plaintiffs, however, the Court will use the figures reflected in Plaintiffs closing argument on the assumption that additional payments have been made to Mains and Jeanes since the conclusion of trial.

judgment interest and prefiling interest at a rate of 10%. The general rule followed by Iowa courts is as follows:

[I]nterest [on a judgment] runs "from the time money becomes due and payable." *Veach v. Farmers Ins. Co.*, 460 N.W.2d 845, 848 (Iowa 1990) (quoting *Woods v. Schmitt*, 439 N.W.2d 855, 870 (Iowa 1989)). In the case of unliquidated claims ... the money becomes due and payable on the date the damages become liquidated, which is usually the date of judgment. *Lemrick v. Grinnell Mut. Reinsurance Co.*, 263 N.W.2d 714, 720 (Iowa 1978) (citing *Thomas Truck & Caster Co. v. Buffalo Caster & Wheel Corp.*, 210 N.W.2d 532, 536 (Iowa 1973)); *Wetz v. Thorpe*, 215 N.W.2d 350, 357 (Iowa 1974) (court holding interest not recoverable on unliquidated claim until it has been reduced to a judgment). The Iowa courts, however, have recognized an exception to the unliquidated claims rule when the damage is complete at a specified time. *Lemrick*, 263 N.W.2d at 720; see also *Veach*, 460 N.W.2d at 848 (citing *Midwest Management Corp. v. Stephens*, 353 N.W.2d 76, 83 (Iowa 1984)). In such a situation, interest runs from the time the damage is complete even though the damage has not been fixed in a specific sum. *Lemrick*, 263 N.W.2d at 720 (citing *Bridenstine v. Iowa City Elec. Ry.*, 181 Iowa 1124, 1135–36, 165 N.W. 435 (1917)).

*Brenton Nat. Bank of Des Moines v. Ross*, 492 N.W.2d 441, 443 (Iowa 1992). As in *Brenton*, the Court believes that the right to recovery has been contested throughout this action and a genuine dispute existed between the parties as to the amount of the Plaintiffs' damages. *See id.* Therefore, the Court declines to award prejudgment and prefiling interest at this juncture.

## B. Plaintiffs' Second Cause of Action: Fraud by Concealment and Plaintiffs' Third Cause of Action: Fraud by Intentional Misrepresentation.

Plaintiffs second and third causes of action allege fraud against Allied. Specifically, Plaintiffs claim that Allied concealed cost of insurance increases despite a duty to inform its regional directors and policyholders of those increases. This concealment and intentional misrepresentation, Plaintiffs claim, induced them to continue marketing, selling and servicing Allied products to make a profit for Allied, when, had they known the truth, they would not have done so. Upon learning the truth, Plaintiffs resigned from Allied, suffered damages, and seek redress, including punitive damages.

The Court agrees with Defendant's assertion that Mains and Jeanes lack standing to assert a fraud claim on behalf of the policyholders of Allied. As a general rule, "a litigant may assert only his or her rights, and not the rights of third parties." *Patel v. Fleur de Lis Motor Inns, Inc.*, 771 F.Supp. 961, 967 (S.D.Iowa 1991). An exception can be made when the party seeking to represent others in court has "a close relation to the third party" and "the third party is unable to protect his or her own interests." *Id.* Neither Mains nor Jeanes possesses such a relationship with policyholders in this matter. Therefore, the Court will only consider Plaintiffs fraud claims as they relate specifically to Mains and Jeanes, and not to the extent they allege fraud against policyholders.

There are five essential elements to a claim of fraud under Iowa law. Plaintiffs must show: 1) Allied made a material representation to Mains and Jeanes; 2) Allied made such a representation knowingly (scienter); 3) Allied intended to induce Mains and Jeanes to act or refrain

from acting; 4) Mains and Jeanes must have justifiably relied on the representation; and 5) Mains and Jeanes must have suffered damages. *See Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981) (citations omitted).

As indicated above, in the Court's discussion of Breach of Contract, the Court believes that Allied did, indeed misrepresent the reasons for the 2% COI increase to Mains and Jeanes. Allied represented to its policyholders and to the Plaintiffs that the COI increase was permissible under the language of the affected insurance policies. In fact, the Court believes that the COI increase was made for reasons other than mortality experience of the company, and as such was impermissible. Thus, Allied clearly misrepresented to its policyholders and to Plaintiffs that its actions were in accord with policy language. The more difficult question is whether Allied made this misrepresentation knowingly and with the intent to induce Plaintiffs to continue to market and sell Allied's products.

Several Allied executives testified at trial to the generally pervasive belief in the insurance industry and at Allied specifically, that the COI could be raised for essentially any reason, and not just for increased mortality experience, up to each individual policy's guaranteed maximum. Those same executives, however, also testified that raising the COI to maximize executive bonuses would be unacceptable and inappropriate under the terms of affected universal life insurance policies. Thus, if the Court were to find that Allied raised the cost of insurance to maximize executive bonuses, it seems clear that Allied would agree that such behavior could constitute fraud. However, were the Court to find that Allied raised the cost of insurance for some reason other than mortality or maximizing executive bonuses, Allied may

well be lacking the intent necessary for a claim of fraud to stand.

At this juncture, the Court notes that, on an instinctual level, it believes that Allied may, indeed, have implemented the COI increase to ensure and maximize executive bonuses. That having been said, however, the Court cannot say that it is convinced by a preponderance of the evidence that Allied increased the COI for such an inappropriate reason. There was significant testimony at trial that Allied implemented the COI increase to cover concerns with new legislation affecting the insurance industry relating to risk-based capital, asset valuation reserves, and interest maintenance reserves. *See* Wells Dep. at 106; Trial Tr. at 68–69, 588. John Duffy is the only Allied executive who was present at the "elevator meeting" who actually testified that the COI was increased to maximize executive bonuses. Even his testimony, however, was premised on the notion that everyone in the elevator "understood" that this was the true reason for increasing the cost of insurance.

The only testimony supporting the conclusion that the increase was actually made to maximize executive bonuses was that of Kaufman, Jeanes and Mains. Kaufman testified that Tom Van Fossen actually told him that the increase was made to maximize executive bonuses. Mains' and Jeanes' testimony was based on Kaufman's statements to them repeating what Van Fossen allegedly told him. However, Van Fossen vehemently denies ever having told Kaufman or either of the Plaintiffs that the reason for the increase was maximization of executive bonuses. Rather, Van Fossen testified that he believed and still believes that the increase was implemented to make a dead block of business more profitable. Trial Tr. at 333.

The Court, then, must weigh the testimony of several executives of Allied, many

of whom were evasive during testimony, against the testimony of Plaintiffs and Kaufman, all individuals who are quite unhappy with Allied at the present time. To make matters more complex, it is debatable whether Tom Van Fossen was actually an employee of Allied at the time he spoke to Mr. Kaufman. Mr. Kaufman cannot place a precise date on the conversation. Rather he states only that "it was, I think, within 60 days of his leaving the company, whenever that was." Kaufman Dep. at 53. Van Fossen testified that he resigned on April 1, 1997, but was receiving severance pay and was, therefore, still on the payroll of Allied for approximately six months thereafter. Trial Tr. at 278–79. If Van Fossen was not actually an employee of Allied at the time he allegedly told Kaufman that the increase was to maximize executive bonuses, then for purposes of the truth of the matter asserted, his testimony would not qualify as an admission and would be hearsay under the Federal Rules of Evidence.

For the Court to find that Van Fossen was actually an employee at the time he spoke to Kaufman, the Court would essentially have to believe that Kaufman spoke to Van Fossen prior to April 1, 1997, received the information, and then called Mains and Jeanes approximately two and one half months later to inform them of the conversation. The Court does not believe this to be an accurate record of events, and therefore finds that all testimony based on a conversation between Mr. Van Fossen and Mr. Kaufman is inadmissible to the extent that it seeks to prove the truth of the contents of that conversation.[4]

Having found statements allegedly made by Van Fossen to be inadmissible hearsay, it is impossible for the Court to conclude by a preponderance of the evidence that the 1994 increase was founded on a desire to maximize executive bonuses. Even were this Court to find that Van Fossen was an employee of the company and allow testimony based on his alleged conversation with Kaufman, the Court would still be unable to conclude by the appropriate legal standard that the COI increase was implemented for such a scandalous purpose. There simply is not enough evidence before the Court to allow it to say, that it is more likely than not that executives of Allied chose to raise the cost of insurance merely to pad their own wallets.

The Court is certain of only one thing regarding the COI increase: that it was not based on the company's expectations as to future mortality experience. The Court, however, is convinced that Allied executives believed as a general matter that they could raise the cost of insurance, up to the guaranteed maximum, to cover all sorts of expenses. There is dispute in the record as to precisely when the company's executives became aware of a decision in the Philadelphia Life case finding that an identical policy provision made it impermissible to raise the COI for reasons other than mortality. However, the mere fact that one Court finds such activity impermissible is not enough to convince this Court that Allied intentionally raised the COI knowing that it was in violation of policy language. Allied executives claim that they were assured by in-house counsel

---

4. The Court notes that a finding that Mr. Van Fossen was not an employee of Allied and the exclusion of testimony based on his statements to Mr. Kaufman does not change the Court's analysis on Count One: breach of contract. Rather, the Court, as evident from its ruling, did not consider Kaufman's, Mains' and Jeanes' statements for the truth of the matter asserted, but instead considered them only for the effect they had on Plaintiffs actions in this case. Allied would be in breach of contract for changing the cost of insurance for any reason other than mortality, not just for changing the cost of insurance to maximize executive bonuses.

that their policies were sufficiently different. At a later time, Allied determined that, to be on the safe side, it should discontinue cost of insurance increases that it had made. While it is a difficult determination to make, the Court is not convinced by a preponderance of the evidence that there is sufficient evidence that Allied intended to conceal or intentionally misrepresent illegalities. The Court simply is not convinced that Allied knew that it was not allowed to raise the cost of insurance for reasons other than mortality. As such, the Court finds that Judgment on Plaintiffs Second and Third Counts for Fraud should be entered in favor of Defendant.

The Court also addresses Defendant's assertion that Plaintiffs' fraud claim is merely a dressed up breach of contract claim. Defendant cites a Second Circuit case which provides that to maintain a fraud claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996). The Court agrees with Defendant's claim that Plaintiffs have failed to show evidence that Allied owed a duty other than the duty of good faith under their contracts. Similarly, the Court agrees that Plaintiffs have failed to present a fraudulent misrepresentation collateral or extraneous to the contract. Plaintiffs do, however, claim additional damages beyond what they claim for breach of contract. Specifically, Plaintiffs request emotional distress damages and punitive damages in addition to any compensatory damages they may receive for breach of contract.

To recover emotional distress damages in an action founded upon breach of contract, Plaintiffs must show that they suffered some physical manifestation as a result of their emotional distress, *Bossuyt v. Osage Farmers Nat'l Bank*, 360 N.W.2d 769, 777 (Iowa 1985), or that emotional distress was particularly likely to result from the Defendant's breach. *Clark Peterson Co. v. Indep. Ins. Assoc.*, 514 N.W.2d 912, 916 (Iowa 1994). Plaintiffs have failed to present any evidence of physical manifestations of distress. Additionally, the Court does not believe that raising the cost of insurance for reasons other than those allowed in insurance policies constitutes the type of breach of contract which is particularly likely to result in severe emotional distress.

Plaintiffs have wholly failed to present any evidence to the Court which would entitle them to damages for emotional distress. Jeanes testified, "Emotionally I suffered greatly ... my credibility and confidence went pretty much in the toilet ... Physically, yeah, it manifested in some areas that were very difficult. It was very difficult in my marriage and there are other areas that were very personal I don't want to go into." Trial Tr. at 221. Mains testified, "it's been tough sleeping at night ... affected my marriage in a way intimacy is not as much as it used to be. I think my joy in life got changed or sucked out ... I certainly have stretches of depression." Neither Plaintiff presented any medical testimony regarding the distress they claim to have experienced upon leaving Allied. Neither Plaintiff offered any support whatsoever to their assertions that they experienced emotional distress. There is simply nothing in the record showing that Plaintiffs suffered emotional distress and there is nothing to support a finding that the emotional distress was attributable to Allied.

■ Plaintiffs also request punitive damages for fraud. Evidence to support an award for punitive damages must be clear, convincing, and satisfactory and must establish a defendant's conduct amounted to a willful and wanton disregard for the rights of another. *See Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 347 (Iowa 1999); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 771 (Iowa 1999). "Willful and wanton" has been defined as follows: "[T]he actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Revere*, 595 N.W.2d at 771. As the Court has had difficulty finding by a preponderance of the evidence that Allied acted with the requisite intent to commit fraud, the Court points out that it would be virtually impossible, on the record now before it, for the Court to find by clear and convincing evidence that Allied acted in willful and wanton disregard of the rights of others so as to justify an award of punitive damages.

### C. Plaintiff's Fourth Cause of Action: Breach of Contract for Failure to Pay Commissions Due

Plaintiffs' Fourth cause of action is a straight breach of contract claim premised on the commissions provision of the Plaintiffs' respective employment agreements. *See* Ex. 1 at § 1(g)-(h); Ex. 2 at § 2(g)-(h). In its June 25, 2001 Order, the Court entered judgment against Allied and in favor of Mr. Jeanes and Mr. Mains on the issue of liability. Because the parties' assessments as to the amount of commissions owed differed sharply, the Court ordered Judgment in Mr Mains' favor to the extent of $70,976.07 and the Court ordered Judgment in Mr. Jeanes' favor to the extent of $51,368.96. Amounts owing beyond these amounts, which were paid to the Plaintiffs just prior to trial, were left for determination at trial.

The Court believes that amounts of commissions owing are adequately accounted for in the Court's calculation of damages for breach of contract. Therefore, the Court declines to make any independent award for commissions under Count Four of Plaintiffs complaint.

### D. Plaintiff Mains' Sixth Cause of Action: Fraud and Conversion

For the same reasons the Court found in favor of the Defendant on Plaintiffs' fraud claims, the Court finds in favor of the Defendant on Mains' individual fraud claim. Specifically, the Court believes by a preponderance of the evidence that Allied believed it could adjust the cost of insurance for reasons other than mortality. The Court is unable to conclude by a preponderance of the evidence that Allied raised the cost of insurance to maximize executive bonuses. Therefore, there is insufficient evidence to convince the Court by the appropriate legal standard that Allied possessed the intent necessary to make a finding on behalf of Plaintiff on his claim of Fraud. While the Court found that Allied did, indeed breach its contract with Mr. Mains, the Court has declined to award any compensatory damages. Plaintiff's request for punitive damages is denied on the same reasoning the Court denied Plaintiffs' joint fraud claim, i.e., Plaintiff Mains has not shown by clear and convincing evidence that Allied possessed the requisite intent to commit fraud.

■ Conversion is defined as "the act of wrongful control or dominion over chattels in derogation of another's possessory right thereto." *Cora v. Strock*, 441 N.W.2d 392, 394 (1989). In determining whether the required control or dominion

exists, the Court may look to several factors:

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

*Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 247 (Iowa 1988) (citing Restatement (Second) of Torts § 222A(2)).

In this case, Allied increased the cost of insurance for reasons other than those stated in Mains' universal life insurance policies. As such, Allied clearly breached the terms of those contracts. However, in his efforts to ensure that policyholders affected by the increase received compensation for money that was charged to them as a result of the cost of insurance increase, Mr. Mains told Sam Wells that a five basis point addition to policyholders' interest rates would be acceptable. Mains' affected policies received this five basis point adjustment. While the Court believes that Allied may have converted the money of Mr. Mains for its own use, the Court is hard-pressed to see how Mr. Mains can claim legal damages for this amount. While ultimately, Mains was unhappy with the five point basis increase to policy interest rates as a resolution to Allied's actions, he willingly accepted the basis increase as a method of resolution. Thus, the Court believes that Mr. Mains was reimbursed for his damages through the interest adjustment and any difference in the appropriate compensation was waived when Mr. Mains accepted the five basis point adjustment as a way to pay back affected policies. Therefore, Judg-

ment on Count Six shall be entered in favor of Defendant.

### E. Plaintiffs' Seventh Cause of Action: Willful Failure to Pay Salary

In Count Seven of their Complaint, Mains and Jeanes allege that Allied willfully and intentionally failed to pay commissions. Plaintiffs allege that their employment agreements with Allied provided that Allied would pay them a salary based on commissions earned by the sale of insurance policies. A short time after Mains and Jeanes resigned their positions with Allied, the company "turned off" further payment of earned commissions, allegedly on the basis that Mains and Jeanes had not returned company property and had encouraged the replacement of Allied policies with those of other companies.

Count Seven is premised on Iowa Wage Payment Collection Law, which protects the rights of employees as against employers upon the cessation of the business relationship. *See* Iowa Code § 91A *et seq.* (1997). Included in the definition of an employee is "a commission salesperson who takes orders or performs services on behalf of a principal and who is paid on the basis of commissions...." Iowa Code § 91A.2(3). While the statute includes commissioned salespersons, it does not include under its ambit independent contractors. Naturally, Plaintiffs and Defendant disagree over whether Plaintiffs qualify as independent contractors or commissioned salespersons under the statute.

 The Agency Agreements Mains and Jeanes entered into with Allied each contain a specific provision under paragraph 1(a): "Independence: As an independent contractor, you are free to exercise your discretion and judgment as to time, place and means of performing all authorized acts hereunder. Nothing in this Agreement is intended to create a relationship of employer and employee be-

tween us and you." *See* Ex. 1 at para. 1(a); Ex. 2 at para. 1(a). The mere fact that an employment or agency agreement has a provision designating an individual as an independent contractor is not conclusive, however. *See Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 217 (Iowa 1984). The primary consideration in determining whether an individual is an employee or an independent contractor for purposes of the Wage Payment Collection Act is the right to control the physical conduct of the worker, not the intention of the parties. *See id.* (citing *Greenwell v. Meredith Corp.*, 189 N.W.2d 901, 904–05 (Iowa 1971)). "An independent contractor, under the quite universal rule, may be defined as one who carries on an independent business, and contracts to do a piece of work according to his own methods, subject to the employer's control only as to results." *Mallinger v. Webster City Oil Co.*, 211 Iowa 847, 234 N.W. 254, 256–57 (Iowa 1931).

A great deal of testimony was adduced at trial regarding the nature, duration, and context in which Plaintiffs performed their jobs with Allied. Jeanes testified that he took directives from executives at Allied, was assigned the agencies with which he worked, was required to concentrate almost solely on property and casualty agencies, was required to attend company meetings on a regular basis, was required to hold meetings for agents in his territory. Trial Tr. P. 216–17. Jeanes also testified that it was his understanding that if he refused to do these things, he would be terminated from his position with Allied. *Id.*, p. 217. Mains similarly testified that Allied assigned agencies to regional directors and took them away, that regional directors were required to go to regional meetings and attend new sales meetings, that the bulk of a regional director's time was required to be spent with Allied agencies, and that if a regional director didn't call on agencies, his contract with Allied would be terminated. Additionally, Mains testified that he was expected to entertain agents on company trips. Finally, Mains indicated that Allied provided all applications, training materials, tapes, disks, and promotional items for use by regional directors.

On the other hand, Tom Van Fossen testified that there were no requirements that Jeanes and Mains put in certain hours, check in with the company on a regular basis, report their daily activities, report the times or hours they worked, report sales they made or contacts they made. Additionally, Van Fossen stated that Allied had no authority over who worked in Mains and Jeanes individual offices, how many employees they had, their expenses, books, records, maintenance of their own offices. Finally, Van Fossen pointed out, Mains and Jeanes had a similar relationship with several other insurers.

While there is evidence supporting a categorization of both Jeanes and Mains as independent contractors as well as employees, the Court believes that Allied exerted a sufficient amount of control over its regional directors to characterize the relationship as one of employer and employee. Specifically, the Court is convinced that Allied designated where and with what agencies its regional directors could work. It provided materials, information, applications, software, and training materials to the regional directors to use in contacting agents within the assigned territories. Allied insisted on a certain number of "calls" to be made to each agency within a regional director's territory and set goals and bonus levels that, if not met, could result in the termination of the agency contract. Allied exercised what amounted to a "right of first refusal"—expecting its regional directors to sell its policies before those of any other company. While Mains and Je-

anes were free to hire their own support staff and do business with other companies, it appears clear from the record that any work they did for Allied was tightly controlled by Allied. As such, the Court believes that Jeanes and Mains were commissioned salespersons within the meaning of "employee" in the Iowa Wage Payment Collection Act.

■ As an employee under Section 91A of the Iowa Code, Jeanes and Mains were entitled to be paid "all wages earned, less any lawful deductions ... not later than the next regular payday...." Iowa Code § 91A.4. "If there is a dispute between an employer and employee concerning the amount of wages ... the employer shall ... without condition ... pay all wages conceded to be due ... less any lawful deductions...." Iowa Code § 91A.7. Section 91A.8 provides:

When it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses ... whether as the result of a wage dispute or otherwise, the employer shall be liable to the employee for any wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary. In other instances the employer shall be liable only for unpaid wages or expenses, court costs and usual and necessary attorney's fees incurred in recovering the unpaid wages or expenses.

The 1994 and 1996 contracts between Jeanes and Allied and Mains and Allied both state:

Commissions: We will pay you, as full compensation for all services rendered and expenses incurred by you: 1) commissions on premiums paid on policies issued and delivered through you after this Agreement becomes effective. Any commissions and service fees to which Agent may be entitled shall be paid to you only after all of (i) the issuance and delivery of the policy, (ii) the due date of the premium, and (iii) the receipt of the gross premium by the Company; 2) override commissions on premiums paid on policies issued and delivered by assigned agents (including but not limited to ALLIED Property/Casualty agencies.) Override commission will be paid only on those policies written during the time such contracted agencies are coded as assigned agents.

Exhibit 1, para. (g); Exhibit 2, para (g).

There is no dispute that Allied did not pay any commissions to Mains and Jeanes for a time from approximately one month after their resignations on January 9, 1998 until June 14, 2001. Section 91A.8 provides that absent evidence of intent, the employer is liable for wages, court costs, and the usual and necessary attorney's fees incurred in recovering the unpaid wages. Thus, the contested issue is whether Defendant intentionally withheld commission payments from Plaintiffs and relatedly, whether Plaintiffs are therefore entitled to liquidated damages.

Allied argues that Plaintiffs in this matter do not qualify for liquidated damages because Allied's initial refusal to pay the commissions was based on a good faith belief that the commissions were not due and owing. *Condon Auto Sales & Serv., Inc. v. Crick* supports the proposition that "liquidated damages are directed at employers who fail to pay wages knowing the wages are due." *Condon*, 604 N.W.2d 587, 597 (Iowa 1999) (citing *Halverson v. Lincoln Commodities, Inc.*, 297 N.W.2d 518, 523 (Iowa 1980)). "Conversely, liquidated damages are not available if an employer maintains a good faith dispute over the amount of wages." *Id.* The key to understanding when liquidated damages are

payable is the term "good faith." If Allied knew that some amount of commissions were due Mains and Jeanes, then their failure to pay the undisputed amount would amount to intentional failure to pay commissions due under the Iowa Wage Payment Collection Act. *See Condon,* 604 N.W.2d at 598 (finding intentional failure to pay wages when the employer knew employee was owed a certain amount of money and the only dispute dealt with money owed by the employee to the employer). However, if Allied possessed a good faith belief that it was not obligated to pay any further commissions to Mains and Jeanes, even if a Court should ultimately decide that that belief was wrong, Allied would not be liable for liquidated damages.

Defendant contends that the reason for withholding Plaintiffs' commissions was Allied's good faith belief the commissions were not due and owing. Allied claims that it terminated the commission payments pursuant to Paragraph 3(d) in Jeanes and Mains contracts which provided that Jeanes and Mains would have "no rights to any commissions, commission overrides or other compensation" if they breached any provision of Paragraph 3(d). Specifically, Allied claims that Jeanes and Mains failed "to promptly return physical property belonging to the Company when requested to do so" and caused or attempted to cause "policyholder[s] of the Company to discontinue [policies]." Notably, however, Tom Van Fossen testified that the Company's normal policy upon the termination or resignation of a regional director was to negotiate a severance package within approximately thirty days. Trial Tr. at 309. Van Fossen himself resigned under threat of termination, yet was never asked to return items to the company and was never questioned about when and if he returned items to the company. *Id.* at 310.

In a letter dated February 26, 1998, Allied, through counsel, requested that Mains and Jeanes return all materials belonging to Allied. *See* Ex. 79. By March 25, 1998, Mains and Jeanes commissions had clearly been "turned off" and their attorney informed Allied that all items still in Mains' and Jeanes' possession would be returned. *See* Ex. 80. On April 1, 1998, another letter from Allied counsel noted more specific items that Allied claimed Mains and Jeanes had not returned. *See* Ex. 83. By April 7, 1998, Plaintiffs' counsel had again responded, including a letter from Mr. Jeanes specifically addressing all issues raised by Allied and a comment that Mr. Mains was still going through his office to see if he had the items Allied demanded. *See* Ex. 84; Ex. 85. On April 13, 1998, Allied's counsel informed Plaintiffs that Jeanes' commissions would be processed. *See* Ex. 86. Mains personally wrote a letter addressing Allied's demands to Allied counsel on April 22, 1998. *See* Ex. 87. Allied responded by stating it would be conducting further investigation. *See* Ex. 88.

Allied also points out its "good faith" dispute over commissions owed by claiming that Jeanes and Mains gave false information to clients of Allied, however, Allied was unable to present any documentation other than the deposition testimony of Sam Wells. *See* Ex. 91. Allied claimed that Mains and Jeanes "encouraged" policyholders to replace Allied policies through newsletters sent out by their private firms. In one example, Jeanes states in a newsletter, "Some companies raised mortality costs and never bothered to inform policyholders of this action. We refuse to promote carriers that have engaged in this practice...." Ex. 101. In a newsletter from Mains was a brief article indicating that Mains had resigned from Allied and that a class action suit was filed against Allied on January 20, 1998. Ex. 101.

Mains and Jeanes deny ever having encouraged any Allied policyholder to replace their policies with those from another company. Indeed, in a July 1998 newsletter, Mains stated,

In January we ceased to represent ALLIED Life Insurance Company. Since then there has been some confusion about our position regarding the replacement of in-force policies. We want to make it clear that Mains & Associates does not encourage replacing the policies of any company. It is the responsibility of each agent to determine if the replacement of an individual policy falls within the guidelines set forth by the California State Department of Insurance and is in the best interest of the policyholder.

Ex. 102. The Court is not convinced that the comments in Jeanes and Mains newsletters were anything more that general comments made in an attempt to inform their personal clientele about issues going on in the industry and with their personal firms. Despite Allied's, and specifically Sam Wells' belief that these newsletters were damaging to Allied business, the Court can see nothing in these newsletters geared to induce Allied customers to take their business elsewhere.

Allied also claims that Jeanes and Mains "replaced" Allied policies with policies from other companies. *See* Wells Dep. at 154–61. In his deposition testimony, Wells addressed his belief that Mains and Jeanes had replaced Allied policies:

Q: Do you have any information, sir, that at any point in time Mr. Jeanes actually replaced your policies?

A. Yes

Q. Okay. How many policies do you think he replaced?

A. I don't recall.

Q. More than one?

A. Yes.

Q. More than two?

A. I–I don't recall.

Q. Okay. Well, how do you know he did that?

A. Because we have signed replacement forms.

Q. Okay. And where have you seen them?

A. In our office.

Q. How many such forms have you seen?

A. A number.

Q. Give me a best estimate.

A. I can't. I don't specifically recall

Wells Dep. at 154–55. The questioning continued:

Q. Okay. But does that happen periodically, that people just go to another company to get another policy?

A. It may.

Q. Were policyholders free to do that?

A. Yes.

Q. [D]o you have any information, sir, that that decision by the policyholder was caused by anything Mr. Jeanes did?

A. That's what he does when he signs a replacement form as the replacing agent.

Q. Does what? What did he do?

A. That he caused the replacement of our business to somebody else's.

Q. How did he cause it?

A. Through asking the client to exchange one policy for another.

Q. Okay. And you're indicating to me that you have information that Mr. Jeanes went to that particular client and said to that client, "You should go with someone else?"

A. What I'm indicating to you is that he signed a replacement form as the replacing agent.

Q. Do you know, sir, that there were not other factors that caused that partic-

ular policyholder to go with another company?

Ms. Tharnish: Object to the form.

A. All I know is Mr. Jeanes signed the replacement form as the replacing agent.

*Id.* at 156–57. Other than speculation and conjecture, Allied has provided no evidence whatsoever that Mains or Jeanes breached the terms of their contracts by encouraging policyholders to replace Allied policies with those of other companies. Wells confirmed that he never actually talked to the policyholders who replaced their policies to find out their reasons for doing so. *See* Wells Dep. at 158.

The Court is convinced by a preponderance of the evidence that all of the reasons put forth by Allied for withholding Plaintiffs commissions were merely a tactic to harass Plaintiffs in an effort to retaliate for Plaintiffs attempts to make Allied accountable for what Plaintiffs believed were Allied's wrongful actions. Mains and Jeanes actively tried in good faith to comply with demands made by Allied regarding the return of materials. Mains and Jeanes voiced their objections repeatedly to Allied regarding allegations that they had encouraged the replacement of Allied policies with those of other companies. Allied does not appear, from the record now before the Court, to have worked toward a good faith resolution of the issues it claims were the reasons for denying Plaintiffs their commissions. As such, the Court believes that Plaintiffs are entitled to liquidated damages pursuant to Iowa Code § 91A.8.

The Court believes that the undisputed amount of commissions in this matter are the commissions that Allied ultimately agreed it owed to Plaintiffs. Therefore, the Court will calculate damages based upon $87,265.20 for Plaintiff Mains and $68,791.16 for Plaintiff Jeanes. Iowa Code § 91A.2 defines liquidated damages:

"Liquidated Damages" means the sum of five percent multiplied by the amount of any wages that were not paid or of any authorized expenses that were not reimbursed on a regular payday or on another day pursuant to section 91A.3 multiplied by the total number of days, excluding Sundays, legal holidays, and the first seven days after the regular payday on which wages were not paid or expenses were not reimbursed. However, such sum shall not exceed the amount of the unpaid wages and shall not accumulate when an employer is subject to a petition filed in bankruptcy.

Clearly five percent of the conceded commission amounts, multiplied by business days for nearly three years would exceed the amount of commissions on which the Court now orders liquidated damages. Because liquidated damages are capped at an amount equal to the unpaid amount, the Court orders that Mr. Mains shall receive liquidated damages in the sum of $87,265.20. Mr. Jeanes shall receive liquidated damages in the amount of $68,791.16. While the Court still declines to add pre-filing interest to these amounts, the Court will order that prejudgment interest be paid on the original commissions concededly owed by Allied to Messrs. Mains and Jeanes. The Court agrees with Defendant's assertion that, because Plaintiffs did not raise their Wage Payment Claim until February 12, 2001, and there is a two-year statute of limitations on actions under Chapter 91A, Plaintiffs may only recover interest from February 12, 1999.

Additionally, pursuant to Iowa Code § 91A.8, the Court orders Allied to pay the reasonable court costs and attorney fees Plaintiffs incurred in recovering their unpaid commissions. The Court agrees that the parties will have to submit evidence, should they be unable to come to an acceptable agreement amongst themselves, regarding the precise amount of attorney

fees attributable to the Wage Payment claim. Thus, the Court will not make a specific determination on this issue at the present time. See LR 54.2 and FRCP 54(d)(2)(B).

## IV. CONCLUSION

Having carefully reviewed all evidence presented at trial, it is the conclusion of the Court that Judgment shall be entered, in accordance with this Order, as follows:

1. As to Count One of Plaintiffs' Complaint–Breach of Contract: Judgment shall be entered in favor of Plaintiffs. The Court has determined damages in the amount of $593,685.26 for Plaintiff Mains and $570,977.99 for Plaintiff Jeanes.

2. As to Count Two of Plaintiffs' Complaint Fraud by Concealment: Judgment shall be entered in favor of Defendant.

3. As to Count Three of Plaintiffs' Complaint Fraud by Intentional Misrepresentation: Judgment shall be entered in favor of Defendant.

4. As to Count Four of Plaintiffs' Complaint Breach of Contract for Failure to Pay Commissions Due: Judgment has previously been entered in favor of Plaintiffs. No additional compensatory award is ordered at this time.

5. As to Count Five of Plaintiffs' Complaint Breach of Insurance Policy Contracts by Mr. Mains: Judgment shall be entered in favor of Defendant.

6. As to Count Six of Plaintiffs' Complaint Fraud and Conversion by Mr. Mains: Judgment shall be entered in favor of Defendant.

7. As to Count Seven of Plaintiffs' Complaint Willful Failure to Pay Salary: Judgment shall be entered in favor of Plaintiffs. Plaintiffs are hereby awarded court costs and reasonable attorney fees, to be agreed upon by the parties and approved by the Court or to be decided by the Court after an additional hearing. Ad-

ditionally, Plaintiff Jeanes is awarded liquidated damages in the amount of $68,791.16. Plaintiff Mains is awarded liquidated damages in the amount of $87,265.20. Both Plaintiffs shall receive prejudgment interest on this award from February 12, 1999.

IT IS SO ORDERED.